**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

04 OCT 22 PM 2: 52

DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SOUTHTRUST BANK, an Alabama banking corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV-04-P-0354-S |
| | ) | |
| COLLINS HOLDING CORPORATION f/k/a Collins Music Co., Inc., a/k/a Collins Music Company, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**
OCT 2 2 2004

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the court on cross-motions to enforce a settlement reached during a mediation that occurred on March 16, 2004, in Atlanta, Georgia ("Mediation"). Pursuant to a prior Order entered by this court, SouthTrust has already received payment of $13,000,000.00 pursuant to this Settlement. The present dispute is whether SouthTrust is entitled to any additional money under the settlement reached at the Mediation.

Presently pending before court are: Plaintiff's Motion for Order to Enforce Settlement Agreement (Doc. #25); Plaintiff's Motion for Order to Find That No Settlement Agreement Exists Between the Parties (Doc. #35); Defendants' Motion for Enforcement of Settlement Agreement (Doc. #26); and Defendants' Amended Motion for Enforcement of Settlement Agreement (Doc. # 41). The parties have filed Memoranda of Law and Supplemental Briefs in support of their respective motions, which the court has reviewed and considered. Further, the court has conducted an evidentiary hearing, carefully considered and weighed the evidence presented, and evaluated the credibility of the witnesses.



After due consideration for the premises of the respective motions, and after careful consideration of the evidence, the legal authorities and the arguments of counsel, the court makes the following Findings of Fact and Conclusions of Law, and consequently, shall enter a Final Order:

(A)   Granting Plaintiff's Motion for Order to Enforce Settlement Agreement (Doc. #25), and denying as moot its Motion for Order to Find That No Settlement Agreement Exists Between the Parties (Doc. #35);

(B)   Denying Defendants' Motion for Enforcement of Settlement Agreement (Doc. #26) and Defendants' Amended Motion for Enforcement of Settlement Agreement (Doc. # 41);

(C)   Directing the Clerk of Court to pay to Plaintiff the amount of $1,241,348.89, plus accrued pro rata interest[1] on that amount contained in the court registry, and further directing the Clerk of Court to pay the balance of the remaining funds, plus accrued pro rata interest on the remaining funds, to Defendants;

(D)   Directing SouthTrust to convey to Defendants and Collins all of the Bank's rights, title and interest in and to the notes and loan documents evidencing all of Defendants' indebtedness to the Bank that is the subject of this action; and

(E)   Dismissing this action with prejudice, with costs taxed to Defendants.

## I.   STIPULATED FACTS

1.   Plaintiff SouthTrust Bank ("SouthTrust" or the "Bank") is an Alabama banking corporation with its principal office in Birmingham, Alabama.

---

[1]The interest calculation shall not take place until after the Clerk of Court charges the administrative assessment fee against the interest accrued.

2.      Defendants Collins Holding Corporation ("CHC") and Carolina Redemption, Inc. are South Carolina corporations with their principal places of business in South Carolina. Collins Coin, Inc. and Collins Games of Georgia, Inc. are Georgia corporations with their principal places of business in Georgia. 501(c)(3) Charity Consultants, Inc. is an Ohio corporation with its principal place of business in Ohio.    These named Defendants are collectively hereinafter referred to as "Defendants."

3.      Fred J. Collins ("Collins") is the Chief Executive Officer, President and controlling shareholder of numerous corporations, including Defendants.

**Loans**

4.      Beginning in 1996, in a series of loans, SouthTrust loaned money to CHC and to other entities owned and controlled by Collins.  Many of these additional corporate entities have since been merged into CHC and thus no longer exist.  This series of loans was made solely to the corporations and Collins never provided SouthTrust with any personal guarantee for the corporate debt.

5.      The loans are evidenced by Loan Agreements, Promissory Notes, Security Agreements, Financing Statements, Extension Agreements and other documents (collectively the "Loan Documents").  The Bank obtained security interests in certain assets of Defendants.  The Loan Documents uniformly provided that any dispute or legal action regarding the loans and transactions between the Bank and Defendants was to be governed by Alabama law and to be heard by a court of competent jurisdiction in Alabama.

6.      Pursuant to the Loan Documents, Defendants promised to pay to SouthTrust all indebtedness due and owing thereunder, including principal, interest, bank late fees, attorneys' fees, and collection costs.

3

7.     As security for the Loans and pursuant to the Loan Documents, Defendants granted to SouthTrust a security interest in all of Defendants' inventory, documents, instruments, chattel paper, equipment, general intangibles, and accounts whether then owned or thereafter acquired (the "Collateral").

8.     SouthTrust properly perfected its security interest in the Collateral by filing UCC-1 financing statements in South Carolina, Georgia, Alabama, Colorado, Florida, Indiana, Kentucky, Louisiana, Mississippi, Minnesota, Montana, Texas, South Dakota, West Virginia, and Wisconsin.

9.     During the term of the Loans, SouthTrust made efforts to assist Defendants in working out the Loans and avoiding default.  Despite these attempted workouts, default under the Loan Documents occurred.

10.     In October 2001, CHC was in default of its obligations to SouthTrust.  At CHC's request, SouthTrust agreed to enter into the Extension Agreement dated November 1, 2001, pursuant to which SouthTrust gave CHC additional time to pay the indebtedness, to April 30, 2002, with the option to extend the due date to October 31, 2002, provided that several conditions were met (the "Extension Agreement").  Pursuant to a letter agreement between the parties dated November 14, 2002, SouthTrust further extended the deadline for repayment to July 1, 2003.

**IGT Judgment**

11.     On August 2, 2001, the Court of Common Pleas for Horry County, South Carolina entered a verdict and judgment in favor of CHC for breach of contract and breach of contract accompanied by fraudulent act against International Games Technology ("IGT"), a Nevada-based company, in the amount of $15,000,000.00 (hereinafter referred to as the "IGT

Judgment"). IGT, a substantial Nevada company, pursued numerous appeals through the South Carolina appellate courts and to the Supreme Court of the United States. IGT lost at each stage. Despite these losses, IGT had not paid the IGT Judgment at the time this lawsuit was commenced. IGT continues to appeal the IGT Judgment.

12.     SouthTrust contended that they had a perfected security interest in the IGT Judgment. SouthTrust made demand, by letter dated May 30, 2003 (the "Demand Letter"), on IGT, that IGT as a judgment/account debtor of CHC, pay the Judgment directly to SouthTrust. One of the defenses raised by CHC in this lawsuit is that SouthTrust did not have a perfected security interest in the IGT Judgment.

13.     The attorneys who represented CHC in the litigation against IGT (the "CHC Attorneys") brought an action in Nevada (the "Nevada Action") to enforce the Judgment and so that they could be paid the contingency fee that was owed to them and in an attempt to domesticate that Judgment in the state wherein IGT has its principal place of business.

**The Current Action**

14.     On February 10, 2004, SouthTrust exercised its rights under the Loan Documents and filed its Complaint in the current action in the Circuit Court of Jefferson County, Alabama, simultaneously filing its Motion for Writ of Seizure to obtain possession and control of the IGT Judgment.

15.     Defendants timely removed the current action to this court on the basis of diversity.

16.     SouthTrust renewed its Motion for a Writ of Seizure in this court. The hearing on the Motion for Writ of Seizure, which Defendants opposed, was set by this court for Friday, March 19, 2004.

17.     By the time this lawsuit was commenced, Defendants were in default on their loans from the Bank.  Defendants owed SouthTrust $13,788,276.38 in outstanding balance, interest and bank charges, exclusive of attorney's fees and collection costs, as of March 1, 2004. The outstanding principal amount as of March 31, 2004, was $12,882,000.00.

18.     As of March 1, 2004, the IGT Judgment with accruing post-judgment interest calculated at the rate of 14% per annum, was in excess of $20,000,000.00.

19.     After the removal, Plaintiff re-filed its motion in this court and contacted the court to schedule a hearing date for its motion.  The court scheduled a hearing for the Motion for Writ of Seizure for March 19, 2004.  During the scheduling teleconference, the court encouraged the parties to attempt to mediate the dispute prior to the hearing date.

**The Mediation**

20.     SouthTrust and Defendants submitted their dispute to mediation on Tuesday, March 16, 2004, in Atlanta, Georgia before William F. Welch (the "Mediator"), a mediator agreed upon by all parties.

21.     The Mediation occurred in Atlanta, Georgia.  Neither this court nor the parties required any specific place for the Mediation, but Atlanta was chosen because it was convenient for everyone, including Ben E. Dishman, a SouthTrust Vice President, who had recently moved to Atlanta; Theodore Sawicki, litigation counsel for CHC; and the other parties and attorneys who reside in Alabama and South Carolina.

22.     Appearing at the Mediation on behalf of SouthTrust were Ben E. Dishman, and Carol Stewart and Stephanie Williams, litigation counsel for SouthTrust.   Dishman was SouthTrust's representative and had primary responsibility for the loans to the Defendants.

6

23.     Appearing on behalf of the Defendants at the Mediation were Collins, owner of the Defendants, Jerry Saad, a CPA who was Collins' financial advisor, Jim Cassidy, a bankruptcy attorney for the Defendants, and Theodore Sawicki and John Goselin, litigation counsel for Defendants.

24.     The Mediation commenced at 10:30 a.m. and concluded at 8:00 p.m., Eastern Standard Time.

25.     The Mediation was divided into several segments: (1) standard introductory instructions and remarks; (2) "break-out" sessions during which the mediator conducted "shuttle diplomacy" communicating offers, counteroffers, and other information between the parties; (3) an attorneys-only meeting between the mediator and counsel; and (4) a twenty to forty-five minute meeting between Collins and Dishman, for which the mediator was present.

26.     Late in the day, Collins suggested that he and Dishman get together with the mediator alone, without counsel, to see if the impasse could be overcome and a settlement reached.  The key issue that remained unresolved was the total amount that would be paid to the Bank in settlement and satisfaction of the Defendants' indebtedness.  During this private session, the only issue of substance discussed was the amount of this final payment.

27.     The issue concerning early payment of the IGT Judgment was not discussed during the private session between Collins and Dishman.  Although the issue of early payment was discussed earlier, the mediator could not recall a "specific agreement on it, but [he] had a sense that there was a consensus on if there was an early payment . . . that it would be the full amount."

28.     All parties and the mediator agree that a settlement was reached on March 16, 2004.

7

29.     Dishman and Collins agreed in the mediator's presence that they had a settlement, and the principals and the mediator returned to the main conference room and announced to counsel that a settlement had been reached.  The mediator then excused Collins and the others from South Carolina, and counsel, Dishman and the mediator remained.

30.     After Collins and the others left, counsel for SouthTrust then began drafting a Memorandum of Understanding ("MOU") to capture in preliminary form the key terms to which the parties agreed.  Paragraph 4 of the MOU read as follows:

> If IGT complies with the Nevada order or otherwise pays the IGT judgment before June 1, 2004, SouthTrust shall receive all outstanding principal, interest and fees due under the Loan Documents, less any payments made by or on behalf of CHC pursuant to this settlement.

31.     When Defendants' counsel read ¶ 4, he asked Dishman and Welch whether these terms were discussed and agreed to by Collins at the private session.  In response, Dishman admitted that the subject of ¶ 4 had not even been mentioned during the private session.

32.     After a few revisions, counsel for both parties signed the MOU.[2]

33.     According to the settlement reached by the parties, CHC was to pay $2,000,000.00 to SouthTrust upon execution of the forbearance agreement and in no event later than March 31, 2004.  CHC was to pay $7,000,000.00 to SouthTrust on or before June 1, 2004.  The remaining payment term of the settlement was, essentially, in the alternative:  CHC would pay to SouthTrust $4,000,000.00 on March 31, 2005, making monthly payments of interest only,

---

[2] The written MOU, which contemplated a separate forbearance agreement and a consent judgment, was prepared at the end of the day.  The MOU was executed by counsel for SouthTrust and counsel for Defendants on the evening of March 16, 2004, at approximately 8:00 p.m.  At the time Collins left, before the MOU was even drafted, the mediator believed that there was a settlement agreement between the parties.

for a total purchase price for the Loans of $13,000,000.00 **unless** the Judgment was paid by IGT on or before June 1, 2004, in which case, CHC would be required to pay to SouthTrust all outstanding indebtedness, including principal, interest, late fees, attorneys' fees and collection costs, due and owing under the Loan Documents. The latter alternative would result in CHC being obligated to pay more than $13,000,000.00 to SouthTrust in resolution of this Current Action and the subject default under the Loan Documents.

34.     Paragraph 4 of the MOU captures this contingency:

> If IGT complies with the Nevada order or otherwise pays the IGT judgment before June 1, 2004, SouthTrust shall receive all outstanding principal, interest, and fees due under the Loan Documents, less any payments made by or on behalf of CHC pursuant to this settlement.

35.     Defendants argued that, although the MOU was executed by Defendants' counsel at the close of the Mediation, Defendants' counsel did not have authority to agree to ¶ 4 or to execute the MOU on behalf of Defendants. Rather, Defendants argued that the settlement was reached in the private session between the parties, without counsel but with the Mediator, which took place late in the day at the Mediation before the MOU was prepared. Defendants admitted that the settlement agreement they contend was reached was an oral agreement and was never reduced to writing.

36.     At the end of the Mediation on March 16, 2004, counsel called the court and left a voice mail message with one of the law clerks that the case had been settled.

37.     On March 17, 2004, upon being informed by counsel for the parties that the case had been settled, this court entered an Order of Dismissal, dismissing the case without prejudice and ordering the parties to submit a proposed consent judgment by March 26, 2004, or the case would be dismissed with prejudice (the "March 17, 2004 Order").

38.     On Thursday, March 18, 2004, Collins wrote a letter to IGT informing IGT that SouthTrust and Defendants had reached a settlement agreement and advised IGT that pursuant to the settlement agreement "SouthTrust Bank is prohibited from discussing any Collins matter with IGT and its counsel." The Collins March 18, 2004 letter to IGT has been submitted to the court as Joint Exhibit L.

39.     On Friday, March 19, 2004, SouthTrust's counsel forwarded draft copies of the following additional proposed settlement documents to Defendants' counsel: (1) a Forbearance Agreement; (2) a Joint Motion for Consent Judgment; and (3) a Final Judgment By Consent. The draft Forbearance Agreement, Joint Motion for Consent Judgment and Final Judgment by Consent prepared by SouthTrust's counsel have been submitted to the court, collectively, as Joint Exhibit M.

40.     On Tuesday, March 23, 2004, Stewart sent an email to Sawicki to follow up with him regarding the draft documents.

41.     On March 24, 2004, in the Nevada Action, IGT filed (a) a brief in opposition to the CHC Attorneys' motion to enforce attorneys' lien, (b) a motion for leave to pay the IGT Judgment into either of the Nevada or South Carolina courts, and (c) a copy of this court's March 17, 2004 Order.

42.     On the morning of Thursday, March 25, 2004, Collins called Dishman and told him he had been in contact with IGT's president.

43.     On the morning of Thursday, March 25, 2004, Stewart sent another email message to Sawicki, again requesting a status update.

44.     Mid-day on March 25, 2004, Stewart attempted to contact Sawicki via telephone, leaving a message with a receptionist/secretary at Sawicki's firm and asking for an immediate response.

45.     Shortly after the telephone call, Stewart sent another email message to Sawicki.

46.     A few hours later, on March 25, 2004, Stewart again contacted Sawicki via email.

47.     A little after 4:00 p.m., Sawicki responded via email that "our delay resulted only from new developments related to IGT's position and a new agreement between Collins and Dishman."

48.     Sawicki also faxed a letter, which stated that "[t]here have been some developments related to IGT's position, which have led Collins to make a new agreement with Mr. Dishman."

49.     On March 25, 2004, Collins called Dishman and asked if the Bank would be willing to accept $13,000,000.00 in full and final settlement of the matter if the full amount were paid by March 31, 2004, the last day of the Bank's quarterly financial reporting period. Although the Bank authorized Dishman to accept the $13,000,000.00 offer, Dishman never accepted.

50.     Although after the Mediation both sides presented offers that would have resolved this case, it is undisputed that no offer was ever accepted and no new agreement was ever consummated.

51.     On March 29, this court held a conference with the parties and encouraged the parties to draft a joint consent order addressing the outstanding issues in the case.

52.     On March 30, Nevada counsel filed a reply to IGT's motion and brief. CHC argued that SouthTrust had no claim to the Judgment.

11

53.     Thereafter, Collins timely made his first settlement installment payment on March 31, 2004.

54.     On April 2, 2004, this court entered a Consent Order, drafted by the parties, which reflects the undisputed terms of the parties' settlement.

55.     On April 5, SouthTrust moved to intervene in the Nevada action and presented the Nevada court with this court's April 2 Consent Order.

56.     On or about April 6, 2004, the IGT Judgment proceeds were deposited into the registry of this court.  Pursuant to the court's April 8, 2004 Consent Order, the Bank was paid an additional $11,000,000.00, for a total payment of $13,000,000.00.

57.     Defendants received the balance of IGT Judgment proceeds, less $1,500,000.00, which amount (with interest accruing) remains in the court registry subject to the determination of the parties' pending motions.

## II.    ADDITIONAL FINDINGS OF FACT

1.     Neither party had information prior to the Mediation that would suggest IGT intended to pay the Judgment early.  (HT p. 28-29).

2.     Fred Collins is a savvy, experienced, sophisticated business man, whose primary businesses are generally in the highly regulated gaming industry.  (Testimony of Sawicki, HT pp. 122-23).

3.     Collins has been involved in scores of lawsuits and has vast experience dealing with lawyers, with many cases involving large amounts in controversy.  (Testimony of Sawicki HT p. 123; Testimony of Collins HT p.138).

12

**Mediation**

4.　　Collins testified it was his position all along that, if CHC had the money, it would pay SouthTrust and discharge its debt;  Collins told Dishman the only way SouthTrust would be repaid is with the proceeds from the IGT Judgment. (Testimony of Collins, HT pp. 11-12).

5.　　Nevertheless, Collins admitted that he had two motivations during the Mediation: (1) to discount the SouthTrust loan and to use the IGT judgment uncertainty as leverage and (2) to not interrupt the 14% post judgment interest he was receiving on the IGT Judgment. (Testimony of Collins HT p. 25-27).

6.　　Collins believed that IGT Judgment was one of the most significant assets CHC had. (Testimony of Collins, HT p. 16).

7.　　The only "logjam" or impasse issue during the Mediation was the amount of the third payment installment, which ultimately determined the amount of entire settlement. (HT p. 19-20).

8.　　The mediator characterized the Mediation as a "lawyers' mediation." (Welch Depo. p. 33).

**Discussions Regarding ¶ 4**

9.　　The contingency of early payment by IGT  (memorialized in ¶ 4) was discussed at least four times during the Mediation: during opening statements, in the Defendants' caucus session with the mediator, during the attorneys-only session, and during the drafting of the MOU. (HT pp. 23-24; 28-50; 73).

10.　　Defendants knew that ¶ 4 was a term that SouthTrust had to have in the settlement agreement. (Testimony of Sawicki, HT pp. 73, 129).  Despite the term being discussed multiple times, Defendants never rejected the early payment by IGT term.  (HT p. 44).

11.     Both the mediator and Dishman testified that during the Mediation there was a consensus reached as to the early payment term before the private session began.  (HT p. 20, 28; Welch Dep. at 42).

12.     During the private session, Collins and Dishman did not discuss any of the details already discussed and agreed to by consensus earlier in the Mediation, including ¶ 4 and ¶ 8 of the MOU. (HT, p. 30, 37, 58, 67).

13.     Sawicki told Stewart that he did not think ¶4 would be a problem and Welch added it to his list of items not in dispute.  (HT, p. 31-32).  Sawicki testified that "because we didn't think [IGT paying early] was a likely event, I said I don't think it's going to be a problem in the sense that I don't want to tube this settlement process on this relatively unlikely issue." (Testimony of Sawicki, HT, p. 33).

**Signing of MOU**

14.     After the private session Collins left the Mediation early and expressly stated, "I am going to let the lawyers handle the details," that he would "let the lawyers memorialize the agreement," or some variation thereof.[3] (HT pp. 74-75; 141).

15.     Based on the ground rules given by the mediator, Collins knew that there would be a written memorandum of understanding prepared after he left the Mediation that would

_____

[3] It is not lost on the court that the mediator referred to the early payment contingency as a "detail." (Welch Dep. at 42-43; Ex. 1, Draft Declaration at ¶ 7).  Specifically, he noted that "[n]umerous implementing side issues had been discussed earlier in the day, including where there was an early payout by the judgment debtor IGT.  It was acknowledged by Messrs. Dishman and Collins that the lawyers were to draw up the details." (Welch Dep., Ex. 1, Draft Declaration at ¶ 7). Welch said that he "didn't see [the contingency of early IGT payment] as a super important issue that I faced as an arbitrator." (Welch Dep. at 42).  He also testified that a consensus was reached about that detail. (Welch Dep. at 42).

14

memorialize the agreement negotiated that day.  (HT pp. 75; 139; Joint Ex. K). Collins knew that Sawicki would be signing the agreement on behalf of Defendants.  (HT pp. 75-76).

16.    The MOU was drafted from scratch that evening during the Mediation.   The MOU terms, including ¶ 4, were called out and typed in to a computer and all counsel contributed to its drafting.  (HT pp. 70-71).

17.    Sawicki admitted he could have called Collins on his cell phone before signing the MOU, but says he chose not to because he felt that Collins was too emotionally drained. (HT pp. 37-38).

18.    During the drafting of the MOU, Sawicki specifically edited ¶ 4 to protect his clients' interests.  (HT pp. 71; 124-25; 129-30; ST Ex. 2A).

**Sawicki's Authority**

19.    The employment agreement between the Defendants and Alston & Bird provides that the law firm was engaged to serve as counsel to the Defendants in the Alabama case and in connection with other claims or disputes arising out of the Loan Documents.  (Testimony of Sawicki, HT p. 112; Joint Ex. O).

20.    Sawicki's authority to settle was never discussed in any manner during the Mediation or before he helped draft and executed the MOU.  (HT p.113, Collins Depo. pp. 60; 73; 76-77).

21.    No limitation on Sawicki's authority to settle this action was ever communicated to SouthTrust at the Mediation.  (HT pp. 112-14).

22.    Dishman understood that Sawicki had authority to settle the case on behalf of Defendants and to bind Defendants by signing the MOU.  (HT p. 75).

23.   The mediator never heard Collins limit or restrict Sawicki's authority to negotiate on behalf of Defendants. (Welch Dep. at 76).

24.   The mediator believed that it was reasonable for SouthTrust to believe that Sawicki had authority to settle the case even after Collins left the Mediation. (Welch Dep. at 85).

**Dishman's Authority**

25.   Dishman had authority from his supervisor, Fred Crum, to settle the case at a specified amount. (Testimony of Dishman, HT pp. 16-17).

26.   During the private session of the Mediation, Dishman excused himself to call Crum, at which time Dishman recommended that he be given authority to settle the case for $13,000,000.00 based on the Defendants' agreement that if the IGT Judgment was paid before June 1, SouthTrust would receive everything it was owed under the Loan Documents. (HT 68-69). Based on those exact terms, Crum gave Dishman the authority to settle the case; Dishman did not have the authority to settle the case without the early payment term. (HT 118-22).

**Post-Mediation Events**

27.   After the Mediation, Collins contacted IGT and learned that early payment of the Judgment was being considered by IGT. (Testimony of Collins, HT 28-29).

28.   After the Mediation, Collins changed course (or changed his business plan) from the day before. He testified that his business plan had changed from letting the 14% interest continue to accrue as long as possible to vigorously pursuing the early payment by IGT so he would not have to pay $2,000,000.00 out of his own pocket. (HT pp. 27-28; 65-66; 95; 111).

29.   On March 17, Sawicki faxed the executed MOU to Collins and Saad without highlighting or inquiring about ¶ 4. Collins raised an issue about ¶ 4 with Sawicki first. (HT pp.

16

51-52).  Paragraph 4 of the MOU did not fit into Collins' new business plan.  (HT pp. 65-66; 95; 111).

30.     Collins called Sawicki and instructed him to remove ¶ 4 from the agreement. They discussed how best to handle this goal, and "it was decided that [the Defendants] would deal directly with Dishman because that's what Collins had done all along." (Sawicki Dep. p. 54; Collins Dep. pp. 18-19).

31.     Collins, Sawicki, and Jerry Saad, Collins' financial advisor, decided that Saad should call Dishman because he had the best relationship with Dishman. (HT p. 29; 52-53).

32.     Saad called Dishman and informed him there was a problem about ¶ 4, but that Collins intended to stand by the settlement that was reached between them the night before. (Collins Dep. pp. 19-20, 29; Dishman Dep. pp. 52-53).  Saad told Dishman that Collins felt that ¶ 4 "was never clearly discussed, and he clearly never agreed to it and that it was not discussed in that meeting."[4]  Dishman responded that "the bank has to have [the term]." Saad said, "Well Collins might be calling you back" and "We're not going to back out of the deal." (HT pp. 54-58).

33.     At least three drafts of the settlement agreement containing ¶ 4 were prepared and circulated internally by Sawicki after the Mediation. (HT pp. 59; 110; 135; ST Ex. 3A-3C).

34.     On March 18, Collins and Saad prepared a letter to IGT informing IGT that there had been a settlement agreement and that IGT was to have no communication with SouthTrust. (Joint Ex. L).

_____

[4] The court rejects Saad's assertion as even his testimony at the hearing indicated that the subject matter of ¶ 4 was discussed during the Mediation. (Testimony of Saad, HT pp. 46-47).

35.    On March 24, because IGT filed a motion to pay the Judgment into court, Collins and Sawicki learned that the IGT Judgment was going to be paid. (Sawicki Depo. p. 41; 46; 56).

36.    Prior to March 25, 2004, no representative of Defendants ever communicated to this court that there was any problem with the MOU and, therefore, the court dismissed this case on March 17 based upon the telephone call from counsel regarding the settlement. Defendants did not advise the court or counsel for SouthTrust that there was a dispute regarding ¶ 4 until approximately 5 p.m. on March 25, the day before the settlement documents were due to court or, absent such a filing, the case would be dismissed with prejudice. (HT p. 132).

## III.    CONCLUSIONS OF LAW

### A Valid, Enforceable Agreement Which Included ¶ 4 Was Contemplated, Discussed, Negotiated, Agreed to, and Memorialized During the Mediation.

1.    The court finds that, based upon the testimony and evidence presented, the possibility of IGT paying the Judgment before June 1, 2004, although considered unlikely, was contemplated, discussed, negotiated, agreed to, and memorialized as an agreement during the Mediation. Accordingly, based upon the facts as outlined below, the court finds that the parties negotiated and entered into a binding settlement agreement on March 16, 2004, which was memorialized in the written MOU, that included the contingency regarding IGT early payment contained in ¶ 4 of the MOU:

(A)    It was Collins' position all along that, if Defendants had the money, they would pay SouthTrust and discharge the debt; Collins told Dishman the only way SouthTrust would get paid is with the proceeds from the IGT Judgment. (Testimony of Collins, HT pp. 11-12).

18

(B)     The early payment by IGT issue (¶ 4) was discussed at least four times during the Mediation: during opening statements, in the Defendants' caucus session with the mediator, during the attorneys only session, and during the drafting of the MOU. (HT pp. 23-24; 28-50; 73).

(C)     Defendants knew that ¶ 4 was a term that SouthTrust had to have in the settlement agreement. (Testimony of Sawicki, HT pp. 73, 129). Despite the term being discussed multiple times, Defendants never rejected the early payment by IGT term. (HT p. 44).

(D)     Both the mediator and Dishman testified that there was a consensus reached as to the early payment term before the private session. (HT p. 20, 28; Welch Dep. at 42).

(E)     Sawicki told Stewart that he did not think ¶ 4 would be a problem and Welch added it to his list of items not in dispute. (HT, p. 31-32). Sawicki testified that "because we didn't think [IGT paying early] was a likely event, I said I don't think it's going to be a problem in the sense that I don't want to tube this settlement process on this relatively unlikely issue." (Testimony of Sawicki, HT, p. 33).

(F)     After the private session Collins left the Mediation early and expressly stated, "I am going to let the lawyers handle the details," that he would "let the lawyers memorialize the agreement," or some variation thereof. (HT pp. 74-75; 141).

(G)     Based on the ground rules given by the mediator, Collins knew that there would be a written memorandum of understanding prepared after he left

19

the Mediation that would memorialize the agreement negotiated that day. (HT pp. 75; 139; Joint Ex. K). Collins knew that Sawicki would be signing the agreement on behalf of Defendants. (HT pp. 75-76).

(H)    Sawicki admitted he could have called Collins on his cell phone before signing the MOU, but he chose not to do so. (HT pp. 37-38).

(I)     Sawicki signed the MOU and during the drafting of the MOU, Sawicki specifically edited ¶ 4 to protect his clients' interests. (HT pp. 71; 124-25; 129-30; ST Ex. 2A).

(J)     After the Mediation, Saad called Dishman and, although he expressed concern over ¶ 4, he assured Dishman that Collins intended to stand by the settlement that was reached between them the night before and "We're not going to back out of the deal." (Collins Dep. pp. 19-20, 29; Dishman Dep. pp. 52-53; HT pp. 54-58).

(K)    At least three drafts of the settlement agreement containing ¶ 4 were prepared and circulated internally by Sawicki after the Mediation. (HT pp. 59; 110; 135; ST Ex. 3A-3C).

(L)     On March 18, Collins and Saad prepared a letter to IGT informing IGT that there had been a settlement agreement and that, pursuant to ¶ 8 of the MOU, IGT was to have no communication with SouthTrust. (Joint Ex. L). The parties agree (and even if there were not such an agreement, the court would find) that ¶ 8 was never discussed during the private session, yet Collins viewed that portion of the MOU as part of the parties' settlement.

(M) Even after concern was expressed over ¶ 4, Defendants continued to enforce other provisions of the MOU, including ¶ 8.[5]

(N) Prior to March 25, 2004, no representative of Defendants ever communicated to the court that there was any problem with the MOU and therefore, the court dismissed this case on March 17 based upon the telephone call from counsel regarding the settlement. Defendants did not advise the court or counsel for SouthTrust that there was a dispute regarding ¶ 4 until approximately 5 p.m. on March 25, the day before the settlement documents were due to court or, absent such a filing, the case would be dismissed with prejudice. (HT p. 132).

2.   The court finds, based upon the entirely of the testimony and evidence submitted in this case, that: (1) throughout the Mediation, SouthTrust insisted on the early payment term now contained in ¶ 4 of the MOU; (2) the parties reached a consensus on the term and it was agreed to by Sawicki and Collins;[6] (3) during the drafting of the MOU, Sawicki asked about

---

[5]But for the parties' agreement on and existence of ¶ 4, there would have not been a need for the second part of ¶ 8 to be part of the parties' settlement or the MOU. The first part of ¶ 8, prohibiting SouthTrust from selling, compromising, or conveying the debt or the IGT Judgment, protects the Defendants from a compromise of the Judgment by SouthTrust. The second part of ¶ 8, prohibiting SouthTrust from communicating with IGT about any aspect of the matter, mediation, or settlement, only guards against the potential that SouthTrust might learn about such an early payment by IGT, or encourage such an early payment, pursuant to ¶ 4. (HT pp. 117; 125-28).

[6]The court notes that, based upon certain portions of Welch's deposition *transcript*, the Defendants argue there was no agreement between the parties regarding ¶ 4. However, the deposition *videotape* reveals that, although he never polled the parties to determine if an *express* agreement existed as to the IGT early payment contingency, he did believe that the term was agreed to by consensus. (Welch Dep. at 41-42). The mediator emphasized that he "didn't see [the contingency of early IGT payment] as a super important issue that I faced as an arbitrator. I thought there was a consensus on that." (Welch Dep. at 42). Because he thought the term was not in dispute, because SouthTrust indicated it had to be part of the agreement, and because Defendants never indicated they would not

whether there was any discussion about ¶ 4 during the private session because he wanted to make certain that Collins and Dishman had not revisited or altered that already agreed-to term; (4) Sawicki was satisfied by SouthTrust's response that the private session negotiations did not modify or alter the parties' consensus on that term reached earlier in the Mediation; (5) Collins decided he wanted ¶ 4 off the table when, after the Mediation, he either suspected or discovered that there was a possibility of early payment by IGT; and (6) only then, after the Mediation, did Collins implement a plan to either call into question the validity of ¶ 4, or renegotiate it, because at that later time (*i.e.*, after learning that early payment of the Judgment was more likely than he earlier believed) it would have been to his financial advantage to do so.

3.     Before and during the Mediation, Collins: (1) had told SouthTrust that if the IGT Judgment proceeds were available, he would pay all loan obligations in full; (2) did not believe that IGT would pay early; (3) wished to negotiate a discount on the loan in order to limit the amount of personal funds he would have to pay to satisfy Defendants' indebtedness to SouthTrust; and (4) did not reject the early payment contingency (later memorialized as ¶ 4) because, at that time, he did not believe there was any likelihood that IGT would voluntarily pay the Judgment and, further, was most concerned with limiting the amount of personal funds that he would contribute to pay off the indebtedness, and the IGT contingency helped him accomplished that goal.

4.     In concluding that the parties agreed to settle the case, and specifically that Defendants agreed to ¶ 4 as a component of that settlement, the court specifically rejects any

---

agree to the term, the mediator listed the IGT early payment contingency in the "not contentious" column. (Welch Dep. at 41-42). The court finds that the mediator's view that there was a consensus on the subject matter of ¶ 4 supports SouthTrust's arguments in this case and is itself supported by the fact that the parties included that term in the MOU.

testimony to the contrary provided by Saad, Collins, and/or Sawicki because the court finds such testimony is not to be credited.  The court so finds because the actions of Saad, Collins, and Sawicki were inconsistent with their testimony, and on many occasions, their testimony was internally inconsistent.  In addition, at the hearing, Collins acted as an advocate, not a witness. He was short on details and rationale explanation, and long on hyperbole.[7]

5.      Pursuant to ¶ 4, given the fact that IGT paid the Judgment prior to June 1, 2004, the contingency upon which ¶ 4 is based is no longer contingent, and SouthTrust is entitled to "all outstanding principal, interest, costs, and fees due under the Loan Documents, less any payments made by or on behalf of CHC pursuant to this settlement."

**Alternatively, Even If the Parties Did Not Enter into an Actual Agreement That Included ¶ 4, Sawicki Possessed Apparent Authority to Enter into the MOU and ¶ 4.**

6.      Alabama choice of law principles dictate that the "law of the state wherein a contract was executed governs questions regarding the validity and interpretation of the contract." *American Nonwovens, Inc. v. Non Wovens Eng'g*,  648 So.2d 565, 567 (Ala. 1994). In Alabama,  there are two choice of law rules governing contracts: (1) those cases involving the

---

[7]Essentially, Collins' position is that he was "horse trading" to discount the Loans, which had been in default for a substantial period of time, by telling SouthTrust that he could not, in the foreseeable future, receive payment on the sizeable Judgment his company had obtained against IGT.  At the same time, he contends that he had no interest or incentive to try to collect the IGT Judgment until SouthTrust substantially discounted the Loans.  He also asserts that his goal was to not do anything to interrupt the continuing accural of 14% interest on the Judgment until he successfully discounted his loan with SouthTrust.  To be very clear, and as already noted, the court rejects Collins' position that he did not agree to the terms of ¶ 4 at the Mediation.  But, in any event, if Collins' plan was as he contends, it is a legal irony that his questionable business practices and ethics are such that they would lead to the result the court reaches today and perhaps worse for him.  For example, if Collins knew or believed before the mediation that the IGT Judgment could be paid, but said differently during the Mediation, SouthTrust may well have claims against him and his companies for misrepresentation and/or material suppression.  The court need not answer those questions today, however, because it finds Collins agreed to the terms of ¶ 4 and, in any event, that Sawicki had at least apparent authority to agree to the same.

validity or formation of the contract; and (2) those cases in which the parties are litigating performance under a contract. *See Jones v. Jones*, 18 Ala. 248, 250 (1850); *Macey v. Crum*, 30 So.2d 666, 669 (Ala. 1947). Where a dispute is based on the existence or validity of a contract, "[i]t is a principle of law, admitted by all courts, that the *lex loci contractus* [the law of the place where the contract was made ] must govern as to the validity, interpretation, and construction of the contract." *Jones*, 18 Ala. at 250.[8]

7.     In this case, because the parties dispute the validity or existence of a particular agreement, the crux of this case hinges on the validity of the MOU. Here, it is undisputed that the MOU was executed in Atlanta, Georgia. Accordingly, in determining the validity or formation of the MOU, this court finds that the law of the State of Georgia is applicable.

8.     Under Georgia law, an attorney can bind his client to a settlement agreement by either apparent or actual authority. Under Georgia law, an attorney of record has apparent authority to bind his client unless his lack of authority is expressly communicated to the opposing party. *Pembroke State Bank v. Warnell*, 471 S.E.2d 187, 189 (Ga. 1996). As noted by the Georgia Supreme Court: "An attorney of record has apparent authority to enter into an agreement on behalf of his client and the agreement is enforceable against the client by other settling parties....The authority may be considered plenary unless it is limited by the client and that limitation is communicated to opposing parties." *Brumbelow v. Northern Propane Gas Co.*, 308 S.E.2d 544 (Ga. 1983). Accordingly, implied or unspoken restrictions on an attorney's authority to settle a case are not sufficient. *Id.* "The client's remedy, *where there have been*

---

[8] As opposed to the traditional *lex fori* rule, or law of the forum, which applies to cases in which the existence or validity of the contract is admitted but the performance under the contract or the remedy for breach is at issue. *Macey*, 30 So.2d at 669.

*restrictions not communicated to the opposing party*, is against the attorney who overstepped the bounds of his agency, not against the third party." *Brumbelow*, 308 S.E.2d at 675 (emphasis added).

9.       The court finds that, based upon the facts outlined below, Sawicki had apparent authority to enter into the MOU, including ¶ 4:

> (A)   Sawicki is the attorney of record for the Defendants.  The employment agreement between the Defendants and Alston & Bird provides that the law firm was engaged to serve as counsel to the Defendants in the Alabama case and in connection with other claims or disputes arising out of the Loan Documents.  (Testimony of Sawicki, HT p. 112; Joint Ex. O).

> (B)   Dishman testified at trial that based on everything that he saw and heard at the Mediation, he understood that Sawicki had authority to settle the case on behalf of Defendants and to bind Defendants by signing the MOU. (HT p. 75).

> (C)   Sawicki admitted that no limitation on his authority to settle this action was ever communicated to SouthTrust or the mediator at the Mediation. (HT pp. 112-14; Welch Dep. at 76).

> (D)   Sawicki's authority to settle was never discussed in any manner until after the Mediation and after the issue with ¶ 4 came to light.  (HT p.113, Collins Depo. pp. 60; 73; 76-77).

> (E)   The mediator characterized the Mediation as a "lawyers' mediation" and believed it was reasonable for SouthTrust to assume that Sawicki had the

authority to settle the case even after Collins left the Mediation.  (Welch Depo. p. 33, 85).

(F)     When Collins left the Mediation, he expressly left "the details to the lawyers to handle." After Collins made this pronouncement, Sawicki negotiated, assisted in the drafting of, edited, and signed the MOU on behalf of the Defendants.

## IV.    COSTS

The evidence presented by SouthTrust prior to the hearing in this matter showed the outstanding amounts due and owing under the Loan Documents to be as follows:  Principal $1,092,913.45; Interest $13,740.96; and Fees/Costs $108,308.42; for a total due and owing of $1,214,962.83.  The amount of fees/costs as of October 21, 2004, had grown to $157,435.89. There is no dispute about the amount of principal and interest owed.

However, Defendants object to certain of the fees/costs sought by SouthTrust – in the amount of approximately $55,005.20 – on the grounds that such costs were not "reasonable and necessary expenses incurred" by SouthTrust "in connection with" the subject Loans.  (Doc. # 50, at 1).   Specifically, Defendants object to the following: (1) $4,680.50 in fees owed to Burr & Forman relating to the Collins' Montana loan transactions; (2) $4,704.22 in fees owed to Bradley Arant relating to the Montana loan transactions; (3) $20,840.60 in fees paid to the Nelson Mullins law firm relating to a declaratory judgment filed in the United States District Court for South Carolina concerning the priority of SouthTrust's security interest in the contingency fee portion of that judgment claimed by CHC's counsel in the IGT litigation; and (4) $25,950.00 in fees paid to Arthur Andersen relating to an analysis conducted by that firm, as part of a workout of the subject loans, as to whether it was advisable for SouthTrust to make an additional loan to

26

CHC to buy legal pinball machines to replace the gambling machines of CHC ruled to be illegal in South Carolina.  (Doc. # 50, at 2-3).

SouthTrust has conceded that the amounts of $4,680.50 and $4,704.22 are to be excluded from the amount of fees sought.  The court concludes, with respect to the remaining two items in dispute, that the $20,840.60 payable to Nelson Mullins was not a reasonable and necessary expense incurred by SouthTrust in connection with the subject loans.  The court finds, based upon the evidence and arguments submitted by the parties, that SouthTrust should have conceded the priority issue before a declaratory judgment action was filed.  Further, CHC was not a party to that action and did not instigate or contribute to the litigation.  Rather, that lawsuit was solely related to a dispute between CHC's counsel and SouthTrust and regarding their respective priority claims in the amount to be paid in contingency fees to CHC's counsel (as opposed to the amount of the judgment that would be realized by CHC).

The $25,950.00 paid to Arthur Andersen is another matter.  The court finds that payment was a necessary and reasonable cost incurred in connection with the subject Loans, and SouthTrust is entitled to recover that cost.  As their counsel conceded in a phone conference with the court, Defendants were actively considering whether to retool their businesses and replace their gambling machines with pinball machines.  Accordingly, as part of SouthTrust's effort to work with CHC (which was in default) the expenditure at issue was reasonable.

Based upon the court's ruling and SouthTrust's concessions, the fees and costs to be awarded here total $127,210.57.  The court has included this figure in the total amount of $1,241,348.89 (not including interest) to be paid to SouthTrust.

## V.    CONCLUSION

The court finds that Defendants' Motion for Enforcement of Settlement Agreement (Doc. #26) and Defendants' Amended Motion for Enforcement of Settlement Agreement (Doc. # 41) are due to be denied.  Plaintiff's Motion for Order to Enforce Settlement Agreement (Doc. #25) is due to be granted.  Plaintiff's Motion for Order to Find That No Settlement Agreement Exists Between the Parties (Doc. #35) is moot.  A separate final order will be entered.

**DONE** and **ORDERED** this ___22rd___ day of October, 2004.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE